[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 02-15252

_____

D. C. Docket No. 01-01532-CV-BBM-1

**FILED**

**U.S. COURT OF APPEALS**
**ELEVENTH CIRCUIT**
November 7, 2003
**THOMAS K. KAHN**
**CLERK**

LOREN F., by his parents as next friend,
MELANIE FISHER, DAVID FISHER,

Plaintiffs-Appellants,

versus

ATLANTA INDEPENDENT SCHOOL SYSTEM,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(November 7, 2003)**

Before BIRCH and HULL, Circuit Judges, and EDENFIELD*, District Judge.

_____
*Honorable B. Avant Edenfield, United States District Judge for the Southern District of
Georgia, sitting by designation.

EDENFIELD, District Judge:

## I. BACKGROUND

Claiming that their son, "Loren F.," suffers a "nonverbal learning disability," his parents requested that the Atlanta Public Schools (APS) accommodate him under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq*. (1994), and Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 791 *et seq*. (1994). Deeming APS's efforts inadequate, they removed him from an APS school and private-schooled him, then unsuccessfully pursued APS for reimbursement administratively and in district court.

They now appeal, *inter alia*, the district court's denial of their reimbursement claim (for convenience, we will simply refer to "Loren"). We preliminarily note a substantial divergence between the administrative and district court rulings below. Also, Loren presents us with several procedural (*e.g.*, jury trial right) issues. We therefore find it useful to first review some governing legal principles before discussing the merits.

## II. ANALYSIS

### A. IDEA Governing Standards

The IDEA guarantees disabled students a Free and Appropriate Public Education ("FAPE"). *Sch. Bd. of Collier County v. K.C.*, 285 F.3d 977, 979 (11th Cir. 2002). A FAPE is defined as special education services that:

2

(A) have been provided at public expense, under public supervision and direction, and without charge;

(B) meet the standards of the State educational agency;

(C) include an appropriate preschool, elementary, or secondary school education in the State involved; and

(D) are provided in conformity with the individualized education program required under section 1414(d) . . . .

20 U.S.C. § 1401(8). Although the IDEA reflects a structural preference in favor of providing special education in public schools, it recognizes that certain public schools are unable or unwilling to provide appropriate special education services. The IDEA, therefore, provides that the cost of the private school may be reimbursed if the public school did not make a FAPE available to the child in a timely manner. 20 U.S.C. § 1412(a)(10)(C)(ii).

To provide a FAPE, a school formulates an Individual Educational Plan ("IEP") during a meeting between the student's parents and school officials. *See* 20 U.S.C. § 1414(d)(1)(A)-(B); *N.L. v. Knox County Sch.*, 315 F.3d 688, 689 (6th Cir. 2003). An IEP must be amended if its objectives are not met, 20 U.S.C. § 1414(d)(4) (revise it at least annually if deficient); *Kings Local Sch. Dist., Bd. of Educ. v. Zelazny*, 325 F.3d 724, 731 (6th Cir. 2003), but perfection is not required. *CJN v. Minneapolis Pub. Sch.*, 323 F.3d 630, 638-39 (8th Cir. 2003); *K.C.*, 285 F.3d at 982.

Courts thus ask whether: (1) the school complied with the IDEA's procedures; and (2) the IEP developed through those procedures is reasonably calculated to enable the student to receive educational benefits.[1] *Ms. S. v. Vashon Island Sch. Dist.*, 337 F.3d 1115, 1129 (9th Cir. 2003) (citing *Board of Educ. v. Rowley*, 458 U.S. 176, 206-207 (1982)). A "yes" answer to both questions ends judicial review. *White v. Ascension Parish Sch. Bd.*, 343 F.3d 373, 378 (5th Cir. 2003) (citing *Rowley*, 458 U.S. at 206-207).

A "no" answer means no FAPE was provided (due to, for example, a deficient IEP), thus enabling the student to resort to private school and seek reimbursement from the school district under 20 U.S.C. § 1412(a)(10)(C)(ii). *Rafferty v. Cranston Pub. Sch. Comm.*, 315 F.3d 21, 26 (1st Cir. 2002); *see also id.* (court also must find the private school placement proper).

Even where a FAPE is not provided, courts can nevertheless deny reimbursement if a parent's own actions frustrated the school's efforts.[2] *See MM v.*

_____

[1] "The FAPE described in an IEP need not be the best possible one. . . rather, it need only be an education that is specifically designed to meet the child's unique needs, supported by services that will permit him to benefit from the instruction." *Pace v. Bogalusa City Sch. Bd.*, 325 F.3d 609, 618-19 (5th Cir. 2003) (quotes and cite omitted); *see also JSK v. Hendry County Sch. Bd.*, 941 F.2d 1563, 1573 (11th Cir.1991) ("While a trifle might not represent 'adequate' benefits . . . maximum improvement is never required")]; *E.D. v. Enterprise City Bd. of Educ.*, 273 F.Supp.2d 1252, 1263 (M.D. Ala. 2003) ("[A] denial of a FAPE is difficult to establish. The standard for whether an IEP provides a FAPE is whether it is reasonably calculated to confer the basic floor of educational benefits").

[2] Parental involvement in the handicapped child's education is the purpose of many of the IDEA's procedural requirements. *See, e.g., Weber v. Cranston Sch. Comm.*, 212 F.3d 41, 51 (1st

4

*Sch. Dist. of Greenville County*, 303 F.3d 523, 533-35 (4th Cir. 2002) (school district not IDEA liable for its failure to timely complete IEP where parents ceased to cooperate in IEP's completion, preferring to place child in private school); *Doe v. Defendant I*, 898 F.2d 1186, 1189 n. 1 (6th Cir. 1990) (parent could not complain that school district failed to complete a timely IEP when IEP's non-completion was attributable to parent's request that school allow student to perform on his own for a while); *see also Doe v. Ala. Dept. of Educ.*, 915 F.2d 651, 663-64 (11th Cir. 1990).

Courts also can deny or reduce reimbursement if parents otherwise act unreasonably, *see* 20 U.S.C. § 1412(a)(10)(C)(iii)(III); 34 C.F.R. § 300.403(d)(3) ("Upon a judicial finding of unreasonableness with respect to actions taken by the parents"), or if parents fail to give the school proper notice that they reject the school's IEP and/or are removing their child from the school,[3] 20 U.S.C. § 1412(a)(10)(C)(iii)(I); 34 C.F.R. § 300.403(d)(1); *see also M.C. v. Voluntown Bd. of Educ.*, 226 F.3d 60, 68 (2d Cir. 2000).

_____

Cir. 2000); *Doe v. Ala. Dept. of Educ.*, 915 F.2d 651, 661 & n. 9 (11th Cir. 1990); *see also Rowley*, 458 U.S. at 205-06). While this may not be an absolute requirement, it is a goal of the IDEA, and courts should be reluctant to award monies to parents who refuse or hinder the development of a FAPE or IEP.

[3] Even if the parent has acted unreasonably, that may be excused (and reimbursement may be ordered) if one of the four exceptions has been shown, including, that denying reimbursement "would likely result in physical or serious emotional harm to the child . . . ." 20 U.S.C. § 1412(a)(10)(C)(iv)(II); 34 C.F.R. § 300.403(e)(2).

"As the losing part[y] before the district court, [Loren] . . . bear[s] the burden of demonstrating that the [APS] did not comply with the IDEA." *M.L. v. Fed. Way Sch. Dist.*, 341 F.3d 1052, 1064 (9th Cir. 2003); *see also Devine v. Indian River County Sch. Bd.*, 249 F.3d 1289, 1292 (11th Cir. 2001).

**B. IDEA -- Standard of Review**

We review district court IDEA decisions under the standards set forth in *K.C.*, 285 F.3d at 982-83 (whether an IEP provides a FAPE is a mixed question of fact and law subject to de novo review), and *Walker County Sch. Dist. v. Bennett*, 203 F.3d 1293, 1295 n. 6 (11th Cir. 2000) (statutory interpretations are reviewed de novo).

Contrary to Loren's contention, "summary judgment [in IDEA cases] has been deemed appropriate even when facts are in dispute, and is based on a preponderance of the evidence." *Beth B. v. Van Clay*, 282 F.3d 493, 496 n.2 (7th Cir. 2002). That is why the district court's decision "is perhaps better described as judgment on the record." *Id.*; *see also Slama v. Indep. Sch. Dist. No. 2580*, 259 F.Supp.2d 880, 882 (D. Minn. 2003) (On motion for judgment on the record in an IDEA suit, the district court "may make a decision on the merits, even if there exist, upon the stipulated [r]ecord, disputed issues of material fact") (citation omitted).

6

That means that the usual F. R. Civ. P. 56 summary judgment principles do not apply in an IDEA case.[4]  This is not surprising because no IDEA jury trial right exists.  *See Whitehead v. Sch. Bd. for Hillsborough Co.*, 918 F.Supp. 1515, 1518 (M.D. Fla. 1996) (Because only injunctive relief and equitable damages are allowed under the IDEA, there is no jury trial right for IDEA claimants).  The district court often conducts "a bench trial on a stipulated record."  *Slama*, 259 F.Supp.2d at 882 (quotes and cite omitted).

While many courts cite to the commonly applied Rule 56 standards without acknowledging these distinctions, *see, e.g.*, *M.D. v. Southington Bd. of Educ.*, 334 F.3d 217, 220-21 (2d Cir. 2003), we find nothing to prevent district judges from factfinding under F. R. Civ. P. 52 in IDEA cases -- even on a record bearing evidence tendered in addition to the IDEA administrative record -- subject to the requirement that they accord "due weight" to administrative findings.[5]

---

[4]  Though "[s]ummary judgment procedure does not serve to prevent a court from hearing evidence pertaining to questions of material fact," *Victoria L. v. Dist. Sch. Bd.*, 741 F.2d 369, 372 (11th Cir. 1984), it is, at bottom, "simply a procedural vehicle requiring [the district judge] to decide . . . [the IDEA] action on the basis of the administrative record." *Suzawith v. Green Bay Area Sch. Dist.*, 132 F.Supp.2d 718, 724 (E.D. Wis. 2000); *see also Hanson v. Smith*, 212 F.Supp.2d 474, 480-81 (D. Md. 2002).

[5] Courts owe some judicial deference to local administrative agency judgments, *see Deal v. Hamilton County Dept. of Educ.*, 259 F.Supp.2d 687, 691-92 (E.D. Tenn. 2003) (When reviewing IEPs, court keeps in mind that state and local administrative agencies are deemed to have expertise in education policy and practice), though that's typically limited to matters calling upon educational expertise. *Zelazny*, 325 F.3d at 728 (The amount of weight due to administrative findings under the IDEA depends on whether the finding is based on educational expertise) (citing *McLaughlin v. Holt Pub. Sch. Bd. of Educ.*, 320 F.3d 663, 669 (6th Cir. 2003)).

Reimbursement, after all, is "a matter of *equitable* relief, committed to the sound discretion of the district court . . . ." *Roland M. v. Concord Sch. Comm.*, 910 F.2d 983, 999 (1st Cir.1990) (cites omitted; emphasis added), *see also Kurz v. Chase Manhattan Bank*, 273 F.Supp.2d 474, 480 n. 1 (S.D.N.Y. 2003) ("If the award of statutory damages is seen as representing equitable relief then it should go without saying that no right to a jury attaches to claims for equitable relief") (quotes, cite and alterations omitted), so no jury-trial right exists on that score. And factfinding is not limited to bench trials involving live witnesses. *See Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 574 (1985) (Absent clear error, a district court's factfindings cannot be overturned even if they "do not rest on credibility determinations, but are based instead on physical or documentary evidence or inferences from other facts").

Finally, in deferring to the Administrative Law Judge ("ALJ"), the district court must receive and thus review "the records of the [state] administrative proceedings." 20 U.S.C. § 1415(i)(2)(B)(i). Where the district court does not receive any additional evidence or testimony, this court stands "in the same shoes as the district court in reviewing the administrative record and may, therefore,

To that end, administrative factfindings "are considered to be prima facie correct, and if a reviewing court fails to adhere to them, it is obliged to explain why." *MM*, 303 F.3d at 531; *see also G v. Fort Bragg Dependent Sch.*, 343 F.3d 295, 302 (4th Cir. 2003).

8

accept the conclusions of the ALJ and district court that are supported by the record and reject those that are not." *M.L.*, 341 F.3d at 1062.

## C. Loren's IEP Rejection

Loren attended an APS school through the sixth grade, then private school for the seventh and eighth grades. In 1/00, midway through the eighth grade, his parents took him to Dr. Pamela Frey, a psychologist who diagnosed him with a "nonverbal learning disability" (NLD).

On 3/4/00, Loren's mother submitted his application to a private school for the ninth grade. The second page of the application includes the following text: "If you are seeking funding from your school district, please check here." Next to the box, which is checked, Loren's mother wrote: "But can pay without funding from school." The printed text of the application further reads: "Please note your advocate's name and phone number (if applicable) and where you are in the process at this time." Beneath this text, Loren's mother wrote: "Jon Zimring - attorney 404-607-1600. Have met [with] Mr. Zimring [] and plan to meet with school reps in 2-3 weeks. Mr. Zimring expects to be able to complete process by end of this academic year."

Despite the fact that Loren was currently enrolled in private school and had a pending application at a private high school, Loren's mother contacted APS on

4/17/00, via telephone, and expressed an interest in re-enrolling her son in public school. In a letter on 4/20/00, Loren's mother informed APS that she wanted to enroll her son in public school and that he would "need Special Education services." Also in the letter, Loren's mother requested a meeting with Ms. Battle, an administrator for APS's special education needs, "to register Loren and begin to discuss the accommodations and services that he will need. With the end of the school year being so near, I feel it is very important that we meet as soon as possible." The letter then went on to describe her scheduling constraints for such a meeting. Specifically, the letter states that, "I will be out of town from April 26 - May 1, but could meet with you Tuesday, April 25, after 10:30 AM, or after I return to Atlanta. I do not work on Tuesday afternoons but with enough notice could meet you on another day."

On 5/9/00, Loren's parents met informally with APS. Due to the scheduling constraints of Loren's parents and Darlene Brooks, Loren's special education "advocate," the parties did not meet again until 5/24/00. At the meeting, the participants reviewed Loren's case and discussed the concerns of Loren's parents. A timetable was set for Loren's evaluation concerning his eligibility for special education programs. Loren's mother also gave her written consent to the

evaluations and 6/16/00 was set for a meeting to determine her son's eligibility for special education and to develop an IEP.

The next day, an APS speech/language pathologist began assessing Loren but was not able to complete the assessment because Loren's father told the APS speech/language pathologist that he and Loren had to leave. However, APS completed an "OT evaluation," and a learning disability teacher conducted math and reading assessments, while an APS psychologist was to contact Dr. Frey to discuss her evaluation and diagnosis of Loren.

On 6/16/00, the parents and APS personnel reconvened to discuss Loren's special education services availability and, if appropriate, to write an IEP. By then, however, certain evaluations had not been completed and the school system had not had the opportunity to observe Loren in the classroom. Therefore, the group formulated an "interim IEP." During the next 30-60 days, then, classroom observations and evaluations would be completed, after which the group would reconvene.

Loren's parents did not sign the interim IEP. Neither, however, did they reject it. The school added an addendum to the IEP minutes, however, acknowledging the parents' contention that APS lacked a program and training for handling NLD students. Loren's mother (Ms. Fisher) attests that no personnel

11

qualified to implement what Loren needed ever contacted her through Loren's first week of school.

Loren started school at Southside on 8/14/00 but left after five days (8/18/00), never to return. On 8/21/00, Ms. Fisher sent APS a letter rejecting the IEP and informing APS that Loren would be attending private school. She, in essence, stated her belief that the school could not meet her son's needs. This was the parents' first formal IEP rejection notice to the APS.

The APS points to evidence reflecting its attempts, starting on 8/31/00, to contact Ms. Fisher to arrange a meeting to review Loren's IEP. This and subsequent attempts to contact her, it claims, proved fruitless. Ms. Fisher admits she received an 8/31/00 APS letter announcing that it would contact her to arrange an IEP meeting, but denies receiving a follow-up communication from the APS until it communicated with her attorney in April, 2001.

Ms. Fisher does not contend that she ever attempted to contact APS after withdrawing Loren from school on 8/18/00. Rather, she explains that she did not do so because APS's letter stated that it would contact her. She claims she never received any communications from the APS after 8/31/00. Thus, factual issues exist as to precisely what communications, or attempted communications, occurred after 8/31/00 but before 3/21/01.

We do know that after Loren's parents removed him from the APS, they formally challenged his IEP and sought tuition reimbursement through an administrative hearing request on 3/21/01. On 5/23/01, the ALJ ruled in the APS's favor, finding that the parents had failed to provide the APS with sufficient notice of their rejection of Loren's IEP (and their intention to private place him), as required by 20 U.S.C. § 1412(10)(C)(iii)(I), and also failed to provide the APS with a reasonable chance to accommodate Loren.

Specifically, the ALJ concluded that the fact that Loren's parents removed Loren from APS after only five days meant that Loren's parents "cannot, as a matter of law, establish that [APS] failed to provide [Loren] with FAPE . . . ." That is, the fact that Loren's parents gave the interim IEP only five days meant that Loren's parents failed to give the "IEP a chance to succeed, and thus cannot establish that [APS] failed to provide [Loren] with a FAPE." According to the ALJ,

> [t]his is particularly true where [Loren] had not been enrolled in [APS] for two years, and had never demonstrated previously any need for special education and related services. Indeed, because of an utter lack of information regarding [Loren's] needs and abilities, the IEP in question was an interim diagnostic designed to provide [APS] with the opportunity to observe [Loren] in the classroom and gather baseline data, and to conduct evaluations, in order to assess the exact nature of [Loren's] disability and create appropriate programming to meet his individual needs. . . . Where [APS] had promptly responded to

13

[Loren's] requests and was taking the appropriate steps to educate [Loren], it cannot be said to have denied him FAPE.

The ALJ also concluded that "it is beyond dispute that [Loren's] parents never gave [APS] the requisite notice of their rejection of the IEP until after [Loren] had been withdrawn from school and enrolled in the private school in Vermont." That is, Loren's "mother did not provide [APS] with 10-days' notice of her rejection of the IEP and her intent to enroll [Loren] in private school." According to the ALJ,

> the parents refused to respond to [APS's] entreaties to discuss and, if appropriate, modify [Loren's] programming, nor did [Loren's mother] contemporaneously request a due process hearing to challenge [APS's] offered IEP. Instead, the parents waited idle until almost an entire school year had passed, and only then sought a due process hearing to claim the costs of the private placement."

On review before the district court, the APS again prevailed. While finding fault with the ALJ's determination,[6] the district judge nevertheless found for the APS on a different ground -- that Loren's parents had acted unreasonably as a matter of law. This obviated the need to rule on whether the APS provided him with a FAPE.

---

[6] The district court expressed diminished deference for the ALJ's decision because the ALJ summarily decided the issue, included no findings of fact and basically adopted the APS's brief as the ALJ's decision. In light of the result we reach *infra*, we need not decide whether the district court erred in the level of deference it employed.

In a later order, the district court rejected the parents' proffered supplemental affidavits as, *inter alia*, untimely, cumulative, prejudicial to the APS, and contrary to precedent cautioning against allowing losing parties to undercut the statutory role of administrative expertise.[7] Finally, the district court found that Loren failed to establish a Section 504 claim, then denied his IDEA-reconsideration motion.

## D. "Unreasonableness"

Insisting that he qualifies for reimbursement, Loren raises a variety of issues on appeal, including whether the district court erred by failing to recognize that his private-school placement was a remedy for the school's failure to provide an adequate IEP, and thus a FAPE, and not evidence of unreasonableness.

Rather than decide whether APS provided Loren with a FAPE, the district court focused on whether his parents acted unreasonably within the meaning of 20 U.S.C. § 1412(a)(10)(C)(iii)(III) ("The cost of reimbursement ... may be reduced or denied ... upon a judicial finding of unreasonableness with respect to actions taken by the parents"). The district court found it unreasonable that Loren's mother

---

[7] The affidavits Loren's parents sought to admit were presented to the district court more than six months after the close of discovery and were adequately covered by the parents' three prior affidavits. We easily conclude that the district court did not abuse its discretion in excluding the additional evidence Loren's parents sought to admit. *See K.C.*, 285 F.3d at 982 (concluding that the district court did not abuse its discretion in denying motion to supplement record in IDEA case where the motion came more than one year after the close of discovery).

filled out an application to Pine Ridge *before* she contacted APS about enrolling Loren in public school. The district court relied on the fact that Loren's mother indicated on the Pine Ridge enrollment form that she would be seeking funding from the public school system.

Yet, the district court also "assum[ed] good faith on the part of the parents" before finding "unreasonable their apparent unwillingness to communicate with APS regarding their concerns about his IEP and their differences of opinion with APS about its implementation." It further found that "[i]t was also unreasonable for the parents to have acted on the unrealistic expectation that the interim IEP could have been perfectly implemented and suited Loren's needs within the first five days of the school year, prior to the APS's completion of its evaluations." At the same time, the judge did not reach the IDEA's formal-rejection notice requirement, 20 U.S.C. § 1412(a)(10)(C)(iii)(I)(aa)-(bb).

The record supports Loren's contention that in some ways his parents did communicate their "IEP dissatisfaction" with the APS. But there is a difference between voicing general dissatisfaction and formally rejecting an IEP. And it is arguable that Congress sought to compel a definitive rejection (as opposed to vague griping) by enacting § 1412(a)(10)(C)(iii)(I)(aa)-(bb) – a subsection the

16

district court did not expressly apply. That provision specifies that reimbursement may be reduced or denied if

> (aa) at the most recent IEP meeting that the parents attended prior to removal of the child from the public school, the parents did *not* inform the IEP Team that they were rejecting the placement proposed by the public agency to provide a free appropriate public education to their child, *including* stating their concerns *and* their intent to enroll their child in a private school at public expense; *or*

> (bb) 10 business days (including any holidays that occur on a business day) prior to the removal of the child from the public school, the parents did not give written notice to the public agency of the information described in division (aa).

20 U.S.C. § 1412(a)(10)(C)(iii)(I)(aa)-(bb) (emphasis added); 34 C.F.R. § 300.403(d)(1).

The ALJ applied this provision, but the district court did not, instead focusing only on the parents' general unreasonableness. We do not pass on the ALJ's approach because, as we further explain below, the district court did not and, in any event, further factfinding by the district court is needed on it.

But we do reject the district court's conclusion of "unreasonableness" as a matter of law because, on the present record there is a significant disputed factual issue of whether Loren parents were gaming the system to extract free tuition for private school, or simply hedging their bets when faced with a demonstrably

17

under-resourced public school system (one that, as it turns out, generated only an "interim" IEP by the start of Loren's school year).[8]

While in some cases the facts may be so clear as to what occurred as to allow a district court to determine the sequence and meaning of events on summary judgment in IDEA cases, this record contains disputed events about both APS's and the parents' conduct and the intent of the parties. In this case, the district court needs to make specific factfindings as to: (1) the parents' conduct; (2) APS's conduct; (3) when the parties did or did not do certain things; and, more importantly, (4) the parties' intent when they did what they did or did not do.

We further note that, as part of its "unreasonableness" conclusion, the district court seemed to find deficient notification by Loren's parents. *See* R. 63 at 15-16 ("the court finds unreasonable their apparent unwillingness to communicate with APS regarding their concerns about his IEP and their differences of opinion with APS about its implementation"). And failing to provide formal notice under § 1412(a)(10)(C)(iii)(I) may be a form of "unwillingness to communicate."

---

[8] We do not suggest that the actions identified by the district court are, as a matter of law, reasonable. Rather, the district court, after a bench trial, could find these actions unreasonable as a matter of fact. However, in the particular factual circumstances in this case, we cannot conclude that they are unreasonable as a matter of law, even under the standard applicable to IDEA cases.

18

Further, failing to provide the formal 10-day notice may also be an independent ground for denying the claim here.

But in a follow-up order, the district court denied that it based its ruling on Loren's failure to comply with 20 U.S.C. § 1412(a)(10)(C)(iii)(I), apparently to avoid having to reach Loren's argument on the "potential harm exception" to that statutory provision. *See* 20 U.S.C. § 1412(a)(10)(C)(iv)(II).[9] It later reached the § 1412(a)(10)(C)(iii)(I)(bb) issue and construed the term "removal," but then expressly disavowed reliance on this result to support its ruling.

The bottom line is that the district court based it decision on the sole ground that Loren's parents acted unreasonably as a matter of law, but as to that issue, we conclude that a bench trial is needed for the reasons outlined above. While we understand and do not criticize the district court's efforts to dispose of the case on a single, narrow ground, we direct the district court on remand to conduct a bench trial on the entire IDEA case and to make findings of fact and conclusions of law on *each* of the issues in this case, including, but not limited to: (1) whether Loren was provided a FAPE; (2) whether the APS complied with the IDEA's procedures; (3) whether the IEP developed through those procedures was reasonably calculated

---

[9] The safe harbor provision of the IDEA states that "[n]otwithstanding the notice requirement in clause (iii)(I), the cost of reimbursement may not be reduced or denied for failure to provide such notice if . . . compliance with clause (iii)(I) would likely result in physical or serious emotional harm to the child." 20 U.S.C. § 1412(a)(10)(C)(iv)(II).

to enable Loren to receive educational benefits; (4) if Loren was not provided an appropriate FAPE or IEP, whether Loren's parents contributed to, and to what extent, the failure to provide Loren with an appropriate FAPE or IEP by either being unavailable themselves or in not making Loren more available to APS;[10] (5) did Loren's parents act unreasonably under 20 U.S.C. § 1412(a)(10)(C)(iii)(III); (6) when was Loren "removed," for the purposes of 20 U.S.C. § 1412(a)(10)(C)(iii)(I), from public school under the IDEA -- that is was Loren removed from APS when he stopped attending APS on 8/18/00, when his mother sent a formal rejection of the IEP on 8/21/00, when Loren actually enrolled in private school, or on some other date;[11] (7) whether the parents complied with the

---

[10] The fact that Loren's parents may have frustrated the development of an appropriate IEP and, thereby, diminished APS's ability to provide Loren with a FAPE has two potential impacts. First, as noted above, parental involvement in the handicapped child's education is the purpose of many of the IDEA's procedural requirements. *See*, *e.g.*, *Weber*, 212 F.3d at 51; *Doe v. Ala. Dept. of Educ.*, 915 F.2d at 661; *see also Rowley*, 458 U.S. at 205-06. If Loren's parents significantly hindered or frustrated the development of an IEP, the district court may be justified in denying equitable relief on that ground alone.

However, the parents' actions are also relevant with respect to an unreasonableness determination under § 1412(a)(10)(C)(iii)(III). For example, on remand the district court may consider whether Loren's parents were unreasonable when waiting until April, 2000 to trigger APS's involvement after Loren's learning disability was diagnosed in January, delaying development over the summer, or making him unavailable for requested evaluations after his transfer to private school (thus affirmatively impeding IEP-generation).

[11] We do not pass on, but merely note the following legal source on this issue: 3 AMERICANS WITH DISABILITIES: PRACTICE & COMPLIANCE MANUAL § 11:130 (Aug. 2003) ("'Removal,' for purposes of prior notice requirements of Individuals With Disabilities Education Act (IDEA), refers to the actual physical removal of the child from public school; if removal occurs during the school year, the ten business days count back from the date of the intended actual physical removal, and if decision to enroll in private school occurs during a summer recess, the ten

notice requirement in 20 U.S.C. § 1412(a)(10)(C)(iii)(I)(aa)-(bb); and (8) whether

the safe harbor provision in § 1412(a)(10)(C)(iv)(II) is applicable to this case.

Given the complexity of the issues, and in an effort to avoid piecemeal appeals, we

direct the district court to address all issues and make alternative rulings.

## E. Rehabilitation Act Claim

Loren next contends that the district court erred in rejecting his

Rehabilitation Act claim. More specifically, it erred in using the IDEA to strike

some of his evidence and in using the IDEA's "unreasonableness" test in denying

his § 504 claim.

Because the district court seemed to base its Rehabilitation Act claim

decision on its rejection of the IDEA claim, and the record does not enable us to

determine whether that court believed there were alternative reasons to deny § 504

relief, we vacate that ruling, too, for reconsideration on remand.

We note, however, that the nature of the Rehabilitation Act claim figures

into whether Loren holds a jury trial right on this claim. *See Waldrop v. S. Co.

Serv.*, 24 F.3d 152, 157 (11th Cir. 1994) ("[W]e refrain from saying that a jury trial

is constitutionally required in every § 504 action"; jury trial rights often ride on

---

business days mark from the beginning of the public school year or sooner if the child is physically placed in private school. Individuals with Disabilities Education Act, § 612(a)(10)(C)(iii), 20 U.S.C.A. § 1412(a)(10)(C)(iii). *Sarah M. v. Weast*, 111 F.Supp.2d 695 (D.Md.S.Div., 2000)").

money damage claims, but not all awards of monetary damages constitute legal relief); *Whitehead*, 915 F.Supp. at 1523.

We leave it to the district court to decide these procedural issues, including whether a hybrid jury trial (jury on some issues, bench on others) or sequential factfinding (IDEA bench trial first, Rehabilitation Act jury trial second) is warranted. *See* F. R. Civ. P. 39(c); 47 AM. JUR. 2D *Jury* § 36 ("Order of Trial") (May 2003) ("In actions involving both jury and nonjury claims, the court must use its discretion to determine which claim is to be tried first"); *Southland Reship, Inc. v. Flegel*, 534 F.2d 639, 644 (5th Cir. 1976) ("[W]here determination of equitable issues would be conclusive as to the legal issues, the legal issues must be tried first in order to prevent abrogation of the right to a jury trial.").

## III.  CONCLUSION

The judgment of the district court therefore is **VACATED AND REMANDED** for further proceedings.

**VACATED AND REMANDED**.