[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APR 10, 2007
THOMAS K. KAHN
CLERK

_____

No. 05-15769

_____

D. C. Docket No. 03-00065-CV-4-RH

CP,

Plaintiff-Appellant,

versus

LEON COUNTY SCHOOL BOARD FLORIDA,
WILLIAM MONTFORD, Individually and
in his capacity as Superintendent,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

(April 10, 2007)

Before MARCUS, WILSON and COX, Circuit Judges.

WILSON, Circuit Judge:

Our previous opinion in this case issued on October 16, 2006. Upon *sua sponte* reconsideration of this appeal, we vacate our previous opinion and substitute the following opinion in its place.

Appellant, CP, an emotionally disabled student, appeals the district court's final judgment in favor of the Leon County School Board ("the School Board"), denying CP's claims under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. 1400 *et seq*. Pursuant to Fla. Stat. § 1003.57(1)(e), CP initiated two separate proceedings before the Florida Division of Administrative Hearings ("DOAH I" & "DOAH II" ), alleging that the School Board had not complied with its obligations under the IDEA. At both hearings, the Administrative Law Judges ("ALJs") determined that the School Board had not violated the IDEA. The district court reviewed the judgments of the ALJs and found for the School Board on all counts. After oral argument and a thorough review of the briefs and record, we affirm the judgment of the district court.

## I. Background

The purpose of the IDEA generally is "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living

2

. . . ." 20 U.S.C. § 1400(d)(1)(A).  State and local educational agencies are eligible for federal assistance if they have in effect policies and procedures to ensure that they provide a free appropriate public education ("FAPE") to disabled students.  *Id.* § 1412.  The Supreme Court has held that in order to satisfy its duty to provide FAPE, a state or local educational agency must provide "personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction."  *Bd. of Educ. v. Rowley*, 458 U.S. 176, 203, 102 S. Ct. 3034, 3049, 73 L. Ed. 2d 690 (1982).  The Supreme Court has developed a test for determining whether a school board has provided FAPE in cases arising under the IDEA: "(1) whether the state actor has complied with the procedures set forth in the IDEA, and (2) whether the [individualized educational program] developed pursuant to the IDEA is reasonably calculated to enable the child to receive educational benefit."  *Sch. Bd. v. K.C.*, 285 F.3d 977, 982 (2002) *citing Rowley,* 458 U.S. at 206-07, 102 S. Ct. at 3051. This standard, that the local school system must provide the child "some educational benefit," *Rowley*, 458 U.S. at 200, 102 S. Ct. at 3048, has become known as the *Rowley* "basic floor of opportunity" standard. *JSK v. Sch. Bd.*, 941 F.2d 1563, 1572-73 (11th Cir. 1991) ("The . . . educational outcome need not maximize the child's education.  If the educational benefits are adequate based on surrounding and supporting facts, [IDEA] requirements have

3

been satisfied.") (internal citations omitted).

Specifically, the IDEA mandates that schools and parents together develop an individualized education program ("IEP"), a written statement for each disabled child that includes, *inter alia*, "a statement of the child's present levels of academic achievement and functional performance . . . ; a statement of measurable annual goals . . . ; [and] a statement of the special education and related services . . . to be provided to the child . . . ." 20 U.S.C. § 1414(d)(1)(A)(i)-(iii). As we have noted, "the IEP is more than a mere exercise in public relations. It forms the basis for the [disabled] child's entitlement to an individualized and appropriate education." *Doe v. Ala. State Dep't of Educ.*, 915 F.2d 651, 654 (11th Cir. 1990).

The IDEA provides important procedural safeguards to parents and children, including the right to present complaints regarding "the identification, evaluation, or educational placement of the child, or the provision of [FAPE] . . . ." 20 U.S.C. § 1415(b)(6); *Doe,* 915 F.3d at 655. Further, parents and children have a right to present complaints regarding placement of the child or the provision of FAPE and to initiate an impartial due process hearing. 20 U.S.C. § 1415(f)(1); *Doe,* 915 F.2d at 655. Finally, parents have a right to appeal the decision of the administrative hearing officer to a United States district court, where the district court judge will review the complaint *de novo* and may hear additional evidence if necessary. 20

4

U.S.C. § 1415(i)(2)(A); *Doe*, 915 F.2d at 655.

## II. Facts

This case arises from proceedings initiated by CP, a disabled child under the IDEA. The relevant facts are as follows. CP was enrolled in Leon County public schools from 1996 through 2004. During that time, the School Board categorized CP, who suffered from Post Traumatic Stress Syndrome and other disabilities, as emotionally handicapped, making him eligible for special education and related services.[1] From 1996 through 2001, CP received special education and related services from the School Board both in mainstream educational facilities and at PACE, a day treatment program for students with emotional and behavioral problems. While CP made progress in school, he continued to struggle academically and had frequent behavioral problems, including a number of juvenile offenses.

In March 2001, following a period of commitment at West Florida Wilderness Institute, a privately run, moderate risk facility for first time and repeat nonviolent juvenile offenders, CP enrolled at Lawton Chiles High School, a

---

[1]Regardless of the precise diagnosis, the parties do not dispute that CP was a "child with a disability" entitled to rights under the IDEA. 20 U.S.C. § 1401(3)(A). In the lexicon of the applicable Florida Statute, CP was entitled to an "exceptional student"education. Fla. Stat. § 1003.57. Although CP is now over twenty-one years old, beyond the coverage of the IDEA, during all times relevant to this litigation, CP was within the age range covered by the Act.

mainstream facility. In May 2002, prior to the end of the 2001-2002 school year, Chiles administrators convened an IEP meeting to develop an IEP for the 2002-2003 school year. The IEP team[2] recommended that CP continue at Chiles High School, receiving both regular and special education services. CP's mother objected to the IEP's failure to include extended year school services (summer classes), as noted by a statement she wrote next to her signature on the IEP form. The IEP team determined that extended year school services was not necessary. The IEP team provided CP's mother with a copy of the "Informed Notice of Refusal to Take a Specific Action," as required by the IDEA. 20 U.S.C. § 1415(b)(3) (requiring the state educational agency to provide "written notice to the parents of the child . . . whenever the local educational agency . . . refuses to initiate or change" the educational placement). At that time, CP's mother did not file any formal complaints or initiate a due process hearing regarding the May 2002 IEP ("Chiles IEP" or "stay-put IEP"). Thus, the Chiles IEP was implemented for the 2002-03 school year.

CP began the 2002-03 school year with difficulty. In September, CP's teachers reported that he had been sleeping in class, that he was frequently tardy to

---

[2]An IEP team consists of, at a minimum, the parents of the child, one regular education teacher of the child, one special education teacher, and a representative of the local educational agency. 20 U.S.C. § 1414(d)(1)(B).

school and that he was failing three of his seven classes. On September 26, 2002, CP's mother requested a personal aide to accompany CP to his classes. Although a parent-teacher conference was held to discuss the matter, the School Board denied the request. CP's behavior and attendance worsened as the school year progressed. In October, CP's parents requested to have him committed under the Baker Act, Fla. Stat. § 394.451, *et seq.* (setting forth the Florida procedure for involuntary commitment of persons who pose a danger to themselves or to others), and obtained an evaluation of CP by an independent counselor suggesting inpatient trauma treatment was needed. Chiles Principal Merry Ortega immediately requested an IEP meeting. However, before an IEP meeting could be convened, CP was arrested on October 24, 2002 and sent to a juvenile detention center.

On November 12, 2002, prior to CP's release from the detention center, the IEP team conducted an IEP meeting attended by CP and CP's mother. The IEP team developed a plan proposing to place CP at PACE upon his release from detention ("PACE IEP"). CP's mother objected this placement, asking instead for inpatient trauma treatment or for a personal aide at Chiles and for CP to be taught in a separate classroom from other students. The IEP team rejected these requests, standing by its proposal. Plaintiff's mother resisted placement at PACE, and wrote next to her signature on the IEP form that she disagreed and "exercise[d] stay

7

put."[3]  On November 14, 2002, CP's mother filed a request for an administrative hearing raising several issues (DOAH I), alleging that the School Board had not provided FAPE to CP and had violated the procedural requirements of the IDEA. The request again specifically invoked the IDEA's stay-put provision.

CP returned to Chiles on November 20, 2002 upon his release from detention, and resumed his education under the Chiles IEP on November 21, 2002. In January 2003, the ALJ in DOAH I determined that the PACE IEP offered FAPE and that the School Board had complied with IDEA.  CP appealed the ALJ's decision to the district court, and voluntarily withdrew from Chiles for the remainder of the 2002-03 school year.  CP received educational services in Volusia County during that time.

In July 2003, CP sought to develop a new IEP with the School Board for the 2003-04 school year.  The School Board reminded CP in a letter dated July 10, 2003 that CP had invoked stay-put and DOAH I was still on appeal in the district court.  The letter indicated that the School Board was willing to meet with CP to determine whether they could agree on an alternative educational placement.  In a second letter to CP, the School Board indicated that it would only agree to place CP at Chiles under the stay-put IEP, or at Pace under the PACE IEP, unless and

---

[3]The "stay-put" provision of the IDEA prevents local educational agencies from unilaterally changing a child's placement.  20 U.S.C. § 1415(j); *see infra* § IV.

8

until CP and his parents and the School Board could agree on an interim alternative placement. At an IEP meeting on August 14, 2003, the School Board offered alternative proposals, including remaining at Chiles or placement at PACE as had been proposed in the November 2002 IEP. CP's mother and school administrators had ongoing correspondence at the beginning of the school year regarding alternative placements and alterations to the Chiles IEP. However, the only change to the IEP upon which the parties could agree was to include language therapy. Otherwise, the Chiles IEP remained in place as the stay-put IEP.

When the 2003-04 school year began, CP enrolled in a full slate of classes at Chiles. However, during the first few weeks of the school year, he was frequently absent or tardy from class. In September 2003, CP was again arrested. By this time, he had attained the age of majority and was placed in the Leon County Jail. CP requested that he be withdrawn from Chiles and that the School Board provide educational services to him at the Leon County Jail. Although the School Board had never had another student request educational services at the jail, it provided services in accordance with the Chiles IEP while CP was incarcerated.

In November 2003, while the the judgment of the first ALJ was on appeal in the district court, CP initiated another administrative hearing (DOAH II) to determine whether the School Board had properly implemented the Chiles IEP

from August 18, 2003 through November 13, 2003. The ALJ in DOAH II also found for the School Board on every claim, ruling in pertinent part that the School Board properly implemented the stay-put IEP and that CP received some educational benefit at Chiles and while in jail during the 2003-2004 school year. CP amended the complaint in his appeal of DOAH I in the district court to include challenges to both DOAH I and DOAH II.

The district court affirmed the ALJs' decisions in DOAH I and DOAH II. We now hear the appeal from the district court's affirmance.

### III.  Standard of Review

Whether an IEP provided FAPE is a mixed question of law and fact subject to *de novo* review. *Sch. Bd. v. K.C.*, 285 F.3d at 982-83 (citing *JSK v. Hendry County Sch. Bd.*, 941 F.2d at 1571). Specific findings of fact are reviewed for clear error. *Id.* at 983 (citing *Walker County Sch. Dist. v. Bennett*, 203 F.3d 1293, 1295 n. 7 (11th Cir. 2000)).[4] To the extent this issue involves the interpretation of a federal statute, it is a question of law which we review *de novo*. *Walker County Sch. Dist.,* 203 F.3d at 1295 (citing *United States v. Gilbert*, 136 F.3d 1451 (11th Cir.1998); *Rodriguez v. J.D. Lamer,* 60 F.3d 745, 747 (11th Cir.1995); *Morris v.*

---

[4]In contrast, the district court judge conducts an entirely *de novo* review of the ALJ's findings and has discretion to determine the level of deference it will give to the ALJ's findings. *Sch. Bd. v. K.C.*, 285 F.3d at 983 (citing *Rowley*, 458 U.S. at 205, 102 S. Ct. 3034; *Doe* 915 F.2d at 657 n. 3).

*Haren,* 52 F.3d 947, 949 (11th Cir.1995)).

## IV. Discussion

While the district court made rulings on a number of issues, CP challenged only three on appeal,[5] and we find that only one issue merits our consideration: whether the district court correctly ruled that the School Board properly complied with the "stay-put" provision of the IDEA, 20 U.S.C. § 1415(j), by maintaining CP's then-current placement under the Chiles IEP through the 2003-04 school year. Section 1415(j) provides that "during the pendency of any proceedings conducted pursuant to [the IDEA], unless the State or local agency and the parents otherwise agree, the child shall remain in the then-current educational placement of such child . . . until all such proceedings have been completed."[6] The Supreme

---

[5]In addition to the issue addressed in this opinion, CP raised the following issues: (1) whether the district court erred in finding that the School Board's implementation of the Chiles IEP while CP was in jail did not violate the IDEA; and (2) whether the district court erred in finding that the PACE IEP offered FAPE to CP. CP's appellate brief identified a total of four issues, as opposed to the three identified herein. However, issues three and four in the Appellant's Brief are essentially covered by the PACE IEP issue.

[6]Section 1415(j) was formerly codified at 20 U.S.C. § 1415(e)(3). This provision, also referred to as the "pendency" provision, may also be found in the Department of Education Regulations:

> [D]uring the pendency of any administrative or judical proceeding regarding a complaint under [the Act], unless the State or local agency and the parents of the child agree otherwise, the child involved in the complaint must remain in his or her current educational placement.

34 C.F.R. § 300.514(a) (effective until Oct. 13, 2006).

Court has held that Section 1415(j) is "unequivocal," stating "plainly" that a school board *shall not* change the current educational placement unless or until it can agree on an alternative placement with the parents, or until the issue is resolved through the administrative hearing process. *Honig v. Doe*, 484 U.S. 305, 323, 108 S. Ct. 592, 604, 98 L. Ed. 2d 686 (1998) (quoting 20 U.S.C. § 1415(e)(3) (now codified at 20 U.S.C. § 1415(j)).

With the stay-put provision, Congress has provided procedural protection to disabled children and their parents by preventing unilateral action by school administrators in contravention of a child's or parent's objection, until the completion of review proceedings. *Id.*; *Tenn. Dep't of Mental Health and Mental Retardation v. Paul B.*, 88 F.3d 1466, 1472 (6th Cir. 1996). The provision amounts to, "in effect, an automatic preliminary injunction," *Zvi D. v. Ambach*, 694 F.2d 904, 906 (2d Cir. 1982), maintaining the status quo and ensuring that schools cannot exclude a disabled student or change his placement without complying with due process requirements. *Paul B.*, 88 F.3d at 1472. In *Honig*, the Supreme Court stated that even where a disabled child posed a danger to other students, the plain language of section 1415(j) prevails, preventing schools from removing a child from school without the permission of the parents or until resolution by a hearing officer. *Honig*, 484 U.S. at 323, 108 S. Ct. at 604.

12

The drafters of section 1415(j) acknowledged that proceedings under the IDEA may prove "long and tedious." *Id.* at 324, 108 S. Ct. at 605. Because of the potential for lengthy proceedings, "the Act's drafters did not intend [§ 1415(j)] to operate inflexibly." *Id.* at 324, 108 S. Ct. at 605. However, Congress only "allowed for interim placements where parents and school officials are able to agree on one." *Id.* at 324-25, 108 S. Ct. at 605.

In this case, CP argues that the School Board was obligated to implement an alternative placement, abandoning the stay-put IEP, in spite of the fact that the stay-put provision had been invoked and that the parties had not agreed on an interim alternative placement.[7] The thrust of CP's argument is that the School Board violated the IDEA's requirement that local educational agencies update a child's IEP annually in order to provide FAPE, even though the stay-put provision had been invoked and even though the School Board and parents could not agree on an alternative placement. We hold that School Board complied with all of its

___

[7]Appellant cites a number of cases on this issue in his appellate brief, but does not clearly articulate how they support his argument. For example he relies heavily on *Burlington v. Dep't of Educ.*, 471 U.S. 359 (1985). However, *Burlington* is inapposite. In *Burlington*, the parents had unilaterally withdrawn their disabled child from public school, arguing that the school district's placement had denied FAPE. The parents prevailed in the administrative hearing and the placement approved by the hearing officer's decision became the "stay put" IEP. The Court construed the hearing officer's decision as an agreement between the state agency and the parents to alter the educational placement under the stay-put provision, thus the parents were entitled to be reimbursed by the school board for the cost of the private education. *Burlington* does not compel the School Board to agree with the parents' proposed placement apart from the judgment of a hearing officer. Thus, CP's reliance on *Burlington* is misplaced.

obligations under the IDEA.

The IDEA requires the local educational agency to have an IEP in effect for each child at the beginning of each school year, 20 U.S.C. § 1414(d)(2)(A), and requires the IEP team to "review[] the child's IEP periodically, but not less frequently than annually, to determine whether the annual goals for the child are being achieved; [and] revises the IEP as appropriate . . . ." *Id.* § 1414(d)(4)(A). CP argues that the School Board violated the IDEA because it failed to update CP's IEP for the 2003-04 school year.

CP's argument ignores the fact that the Chiles IEP was in place at the beginning of the 2003-04 school year, in accordance with section (d)(2)(A), and that the School Board made attempts on at least two occasions to reach an agreement on an alternative placement for CP. Each time, CP rejected the School Board's alternatives, insisting on the one he proposed. Section (d)(4)(A) does not require the IEP team to *alter* an IEP annually; rather, it requires that it *review* the IEP annually and revise it "as appropriate." Here, the IEP team held an IEP meeting on August 14, 2003 and engaged in an ongoing dialogue with CP's mother regarding possible alternatives. This constitutes a review under section (d)(4)(A). However, the School Board could not change the placement provided in the stay-put IEP because CP had invoked the stay-put provision and the parties could not

14

agree on an interim alternative placement.

Congress has provided that where a parent has a complaint about an educational placement, the parent may seek a resolution through the administrative hearing process. 20 U.S.C. § 1415(f)(1). Further, as noted by the Supreme Court in *Honig*, Congress's clear instruction to the parties is to maintain the status quo unless and until one of two conditions is met: (1) the proceedings have run their course, or (2) the parties can otherwise agree. *Honig*, 484 U.S. at 323, 108 S. Ct. at 604. In this case, at the beginning of the 2003-04 school year, neither condition had been met. CP's claims against the School Board were still pending, and the parties could not reach an agreement on an alternative placement. Thus, the School Board properly maintained CP's placement under the stay-put IEP.

CP also argues that even though the parties could not agree on an alternative placement while the stay-put IEP was in place, the School Board nonetheless should have revised the stay-put IEP and provided an alternative placement because placement under the Chiles IEP failed to provide FAPE. This argument presents a scenario not supported by the facts of this case, because the School Board provided CP with an educational benefit under the Chiles IEP during the 2003-04 school year.[8] DOAH II concluded, and the district court affirmed, that the

_____

[8] DOAH II stated that it did not have jurisdiction to determine whether the Chiles IEP, *as written*, offered FAPE. Accordingly, the district court did not consider the validity of Chiles IEP

15

School Board properly implemented the stay-put IEP, and CP received "some educational benefit" during the 2003-04 school year under the stay-put IEP at Chiles and at the Leon County Jail.[9]  We agree.

Before he left Chiles for the last time in September 2003, CP received adequate instruction both in regular courses and special education courses from qualified instructors.  While in Jail, CP received instruction that was similar in substance to his instruction at Chiles.  He received one-on-one instruction in economics and environmental science in the jail library, and special education classes in attorney booths, from qualified instructors.  Thus, CP received some educational benefit under the stay-put IEP, in conformity with the *Rowley* basic floor of opportunity standard.  Accordingly, we need not consider what course of action a school board *might* take where the then-current placement fails to provide FAPE.  In this case, although the parties could not agree on an interim placement, CP's placement under the stay-put IEP provided him "some educational benefit." *Rowley*, 458 U.S. at 200, 102 S. Ct. at 3048.

Because CP's claims in DOAH I were on appeal in the district court through

as written, and the matter is not before us.

[9]  While the ALJ in DOAH II noted that the School Board had agreed that the Chiles IEP no longer offered FAPE when it proposed the PACE IEP, there was no finding of fact to that effect in DOAH II or the district court, and DOAH II found that the School Board had provided some educational benefit during the relevant time period.

the 2003-04 school year and because the parties could not agree on an interim placement, the stay-put provision remained in effect and the School Board could not unilaterally alter CP's placement. *See Honig*, 484 U.S. at 323-26, 108 S. Ct. at 604-606. The School Board complied with the IDEA by maintaining the status quo, that is, by implementing the Chiles IEP in the 2003-04 school year, during the pendency of the proceedings initiated by CP; and the CP was provided with some educational benefit. Accordingly, we affirm the judgment of the district court.

**AFFIRMED.**